E. Welles Eddy et als. *vs.* Otto Schiebel.

First Judicial District, Hartford, October Term, 1930.
Wheeler, C. J., Maltbie, Haines, Hinman and Banks, Js.

Argued October 8th—decided November 7th, 1930.

*Joseph Weiner,* with whom was *William Gitlitz,* for the appellant (defendant).

*Charles H. Walker,* for the appellees (plaintiffs).

Haines, J.  The jury could reasonably have found from the evidence that the plaintiffs were stockbrokers doing business as partners with offices in Hartford, and a branch office in New Haven in charge of one Arnold. On October 4th, 1929, the defendant, through Arnold, requested the plaintiffs to effect the purchase for him of twenty shares of Electric Bond & Share stock and

agreed to pay therefor the purchase price and the customary broker's charges. The order for purchase was promptly telephoned to the Hartford office by Arnold. This stock is traded in on the New York Curb Exchange and in order to make the purchase it was necessary for the plaintiffs to employ a member of the Exchange. At 11.04 a. m. the same day that the defendant gave the order to Arnold, the plaintiffs, by private wire, transmitted it to Jenks, Gwynne & Co., of New York, members of the Exchange, who bought the stock at 11.44 a.m. at $145.50 per share, and wired that fact to the plaintiffs. The same day the plaintiffs mailed notice of the purchase to the defendant with a request for payment. The defendant has never paid for the stock. The stock was delivered to Jenks, Gwynne & Co. the day it was purchased, being included in a certificate for seventy-five shares, and the cost thereof was charged to the plaintiffs by them. The defendant's refusal to accept a certificate or pay for the stock was based upon the claim that the delivery of the certificate was unreasonably delayed. The plaintiffs claimed to have proved by the evidence offered at the trial, that on October 7th the defendant for the first time directed, by telephone to the New Haven office, that the certificate in street form be forwarded by the plaintiffs to the Merchants National Bank of New Haven with sight draft attached, and these instructions were mailed the same day to the Hartford office and received October 9th. On October 10th instructions were mailed by the plaintiffs to Jenks, Gwynne & Co., who received them the following day and passed them to the margin department and to stenographers for the issuance of transfer directions, which were in turn checked by the margin clerk and stamped and all papers were ready for the transfer October 16th. On this day Jenks, Gwynne & Co.

sent a stock certificate to the Bankers Trust Company, the transfer agents, requesting two certificates for fifteen and twenty shares respectively. On October 22d, however, they received from the transfer agents, one certificate for thirty-five shares in the name of the plaintiffs and forwarded it to the plaintiffs at Hartford. Being thus unable to deliver a twenty-share certificate to the defendant, the plaintiffs, on October 23d, returned the certificate to the transfer agents and requested two certificates, one for twenty and one for fifteen shares, and received them from the transfer agent on October 28th. On the same day they sent the twenty-share certificate with sight draft attached to the Merchants National Bank, but both the certificate and payment were refused by direction of the defendant. Immediately upon such refusal the plaintiffs sold the stock for the account of the defendant at the then market price of $84.625 per share, and notified the defendant of that fact and demanded payment of the balance due on his account, a total of $1243.57 with interest from November 4th, 1929. It does not appear that the foregoing evidence was disputed in any essential particular. The jury could also reasonably have found from evidence before them, that the defendant had previously bought stocks through the plaintiffs and also through another brokerage firm which handled its orders through members of the Exchange; that this stock and the entire market was very active during the fall of 1929 and that it was one of the most difficult stocks upon which to get prompt deliveries at that time. The defendant at the trial claimed that the delivery of the certificate was delayed an unreasonable length of time, justifying him in his refusal to accept it and his refusal to pay for the stock. He had failed, however, to set up this by way of justification in his pleading.

The defendant made no requests to charge, the jury rendered a verdict for the plaintiffs, and the trial court denied the defendant's motion to set it aside. This is assigned as error together with various claimed errors in the charge and in the admission and refusal to strike out certain evidence.

The trial court in its memorandum upon the motion to set aside the verdict, pointed out that the undisputed evidence was ample to support the allegations of the complaint, and that the defendant, in his pleadings, raised no issue as to the authority of the plaintiffs to employ a member of the Exchange to make the purchase thereof, and no issue as to the reasonable delivery of the certificate; that on the admitted facts the execution of the defendant's order by the plaintiffs was proved and that the plaintiffs became entitled to receive payment for the stock from the defendant. The court concludes: "It would seem then, that on the undisputed facts, under the pleadings, the plaintiffs were entitled to a directed verdict." An examination of the evidence in the light of the pleadings confirms the correctness of the trial court's view of the transaction. It cannot be determined from the record just what changes were made in the finding, if any, in compliance with the motion to correct, but it is perfectly clear that the defendant dealt with the plaintiffs as stockbrokers, knowing them to be such; he had dealt with them before in the same capacity and had also bought stock on the Exchange through other brokers. In the absence of any evidence to the contrary it must be inferred that he knowingly assumed the relation of a purchaser of stock on the Exchange through the plaintiffs as his brokers and agents with all the legal incidents of that relation.

"When one employs another to deal in a particular market he will be held as intending that the mode

of performance shall be in accordance with the established customs and usages of that market, as long as the custom or usage is neither immoral, unlawful, unreasonable, contrary to the expressed agreement of the parties, nor such as to change the intrinsic character of the undertaking." *Skiff* v. *Stoddard,* 63 Conn. 198, 219, 26 Atl. 874, 28 id. 104; *Wilhite* v. *Houston,* 200 Fed. 390, 392, 118 C. C. A. 542; *Samuels* v. *Oliver,* 130 Ill. 73, 79, 22 N. E. 499.

The rule supported by the authorities is thus stated: "A customer in giving authority to a broker to negotiate a transaction in a certain trade or market is presumed, in the absence of evidence to the contrary, to have authorized the broker to transact the business in question, in accordance with the rules, customs, and usages prevailing in that trade or exchange; and this is so, although the client does not in fact know what they are, provided the rule or usage is one that merely regulates the mode of performing the contract of agency and does not change its intrinsic character, in which case the client is not bound unless he has knowledge of it when he employs the broker." 9 Corpus Juris, pp. 530, 531, and cases cited.

The contract made between the parties is clear from the pleadings. The defendant engaged the plaintiffs "to effect the purchase . . . for him" of this twenty shares of stock, and he agreed to pay them for it with the customary charges. The plaintiffs effected the purchase of the stock within forty minutes after the defendant's order reached their Hartford office and the Exchange member received a certificate of stock covering the purchase. The notice thereof was at once sent to the plaintiffs and they in turn notified the defendant who thus became the actual owner of the stock and under an obligation, by virtue of his contract, to pay the plaintiffs therefor. Any increase

in the value of the stock, from that time forth, belonged to the defendant and any decrease was his loss. It was subject to his order and could have been sold by him at any moment without reference to the fact that a certificate had not reached him. Where Bunnell & Scranton, stockbrokers, had received an order from a customer for the purchase of certain stock for his account, they at once made the purchase through their representative on the Exchange, who received from the seller a certificate thereof as "proper evidence of title" and Bunnell & Scranton thereupon paid the purchase price, notified the customer that they had made the purchase for his account and risk and charged him with the cost. Thereafter, until the transaction should be in some manner closed, they carried the shares or other like shares ready for delivery when required. We said: "The risk attending this carrying was the customer's. He paid interest upon the moneys furnished by Bunnell & Scranton to pay for the stock . . . bought by them. The right at any moment to command a sale and have an accounting for the proceeds was his." *Skiff* v. *Stoddard*, 63 Conn. 198, 212, 213, 26 Atl. 874, 28 id. 104. In purchasing stock for a customer, the broker acts as his agent; in advancing the money for the purchase, the broker becomes the customer's creditor, and finally, in holding the stock to secure the payment of his advances, he is the pledgee of the stock, and it is immaterial that the actual possession of the stock was never in the customer. *Lamprecht* v. *State*, 84 Ohio St. 32, 41, 95 N. E. 656; *Markham* v. *Jaudon*, 41 N. Y. 235, 240; *Richardson* v. *Shaw*, 209 U. S. 365, 374, 28 Sup. Ct. 512. Save for the broker's lien for his advances, the stock belongs to the customer. *Shiel* v. *Stoneham*, 77 Misc. 125, 135 N. Y. Supp. 1024.

The jury could have found that at the time the de-

fendant became the owner of the stock, he had given no specific directions as to a certificate and that it was not until three days later that such directions were given. At that time the duty of the plaintiffs to effect the purchase set out in the pleadings, had been performed and the rights of the parties thereunder fixed. The defendant owned the stock, a certificate for which was held by the plaintiffs' representative in New York, and he owed the plaintiffs for the amount due therefor with proper charges. Upon the tender of the certificate on October 29th, the defendant definitely refused to carry out his part of the contract and pay the plaintiffs, and they at once sold the stock at the then market price for his account, credited him the net proceeds, and now bring this action to recover the balance due from him with interest. It is this cause of action which is set up by the plaintiffs and no material issues are raised by the pleadings other than the truth of the allegations of the complaint. These being established, the plaintiffs are thus entitled, on the face of the record, to a verdict, and the trial court was not in error in refusing to set it aside, in the absence of reversible error in the charge.

The remaining assignments of error relate for the most part to the charge, and directly or indirectly touch upon the questions raised by the defendant at the trial, such as whether plaintiffs had a legal right to employ a member of the Exchange to execute the order there; whether the plaintiffs exercised reasonable care in selecting Jenks, Gwynne & Co., as such member; whether such member was the agent of the plaintiffs or of the defendant; whether an unreasonable time elapsed before the certificate was offered to the defendant. As we have already suggested, these issues are not raised by the pleadings. In so far,

however, as they may be incidental to the essential issues of this case, we have perhaps made sufficient reference to them in what has been said. We point out, however, that whether the certificate was tendered within a reasonable time may become a question of law under all the circumstances of the case, including the unusual conditions which existed on the Exchange at this period and the difficulty in obtaining transfers of this particular stock, as well as the customs and usages of the Exchange to which the defendant had submitted himself. Upon this latter feature the evidence of brokers was offered, all of which was to the effect that the elapsed time would not be considered unreasonable upon the Exchange under the circumstances then existing. There is nothing in this record to show that the offer of the certificate to the defendant was unreasonably delayed as matter of law. We may add that even if the delay had been pleaded and proved to be unreasonable, the facts show that it was caused in the main by the action of the transfer agent and not by the plaintiffs or their New York representative and for this the plaintiffs certainly could not be held responsible. "A stockbroker who gives his client speedy notice of the purchase of shares of stock for him is not answerable, in the absence of damage to his client, for a delay in the delivery of the stock certificate, where the latter could have dealt with the shares and negotiated them on the strength of such notice, and the delay in the delivery of the certificate was due to the conduct of a competent broker employed by the first broker with the implied consent of the client, to purchase the shares in another city." Quoted in 9 Corpus Juris, p. 543, note 81c., *Buchan* v. *Newell*, 29 Ont. L. 508.

We discover nothing further in the assignments of error that calls for discussion.

There is no error.

In this opinion the other judges concurred.